Argued and submitted April 7, affirmed December 20, 1983

In the Matter of the Compensation of
Henry McGarrah, Claimant.

## McGARRAH,
*Respondent on review,*

*v.*

## STATE ACCIDENT INSURANCE FUND CORPORATION,
*Petitioner on review.*

(No. 79-05440, CA A22990, SC 29084)

675 P2d 159

Darrell E. Bewley, Appellate Counsel, State Accident Insurance Fund Corporation, Salem, argued the cause and filed the petition and brief for petitioner on review.

Robert H. Grant, Medford, argued the cause for respondent on review. With him on the brief was Grant, Ferguson & Carter, Medford.

Evohl F. Malagon, Eugene, filed a brief amicus curiae on behalf of the Oregon Workers' Compensation Attorneys Association.

Before Lent, Chief Justice,** and Linde, Peterson, Campbell, Carson and Jones, Justices.

JONES, J.

Lent, J., filed a concurring opinion.

---

** Justice Lent was Chief Justice when case was argued; Justice Peterson was Chief Justice when decision rendered.

## JONES, J.

The claimant seeks workers' compensation for a mental disorder allegedly arising out of and in the scope of his employment. The Court of Appeals reversed the Workers' Compensation Board and allowed an award of benefits. We allowed review in this case and *Leary v. Pacific Northwest Bell,* 296 Or 139, 675 P2d 157 (1983), to consider these claims for stress-related occupational disease.

We quote the facts and testimony as related by the Court of Appeals:

"Claimant, 40 years old at the time of the hearing, was a deputy sheriff in Jackson County from the fall of 1975 through December 4, 1978. He had worked previously as a deputy from 1969 to 1973, when his back was injured in a job-related automobile accident. After a period of recuperation, he was rehired in 1975. Sometime thereafter, claimant wrote a memorandum to his superiors requesting an investigation into the low morale within the department and apparently suggesting that a certain officer known as 'B.J.' not participate in the investigation. Subsequently, B.J. became a captain and claimant's superior.

"A series of events ensued that convinced claimant that he was being subjected to a personal vendetta by Captain B.J. to encourage him to resign or quit. Those events included the removal of claimant one month early from a public relations job, which he enjoyed, in order to transfer him back to patrol, where it appeared to claimant and to a chief deputy that he was not really needed; his transfer from the day shift to the night shift (which claimant considered a rookie shift), despite his high seniority in the department; failure to promote him to senior deputy status, despite his seniority and his achievement of advanced officer status, when others eligible at that time for the promotion were granted it; frequent oral reprimands in the presence of others by the captain or his subordinates about claimant's appearance, which claimant felt was satisfactory; reprimands for not writing enough traffic tickets; oral reprimands in public for having left his post without authorization when his son was injured at school, although claimant had unsuccessfully attempted to reach his supervisor; a reprimand for abandoning his vehicle, which was stuck in a snowdrift in an area where radio communications were blacked out; and a memorandum inquiring into the possibility that claimant had allowed narcotics to go aboard an airplane while he was supervising security personnel at the

airport, although no investigation was ever conducted to permit claimant to exonerate himself. The reprimands, standing alone, were not as upsetting to claimant as was the fact that they were usually made in the presence of others.

"Claimant did not initiate a union grievance concerning any of the above incidents, although he did write a letter invoking the union contract in response to his early transfer back to patrol. By the same token, the reprimands were unofficial disciplinary actions. That Captain B.J. was the source of low morale in the department was corroborated at the hearing by a former colleague of claimant. Another former officer confirmed that Captain B.J. exhibited a pattern of putting pressure on individual officers through manipulation of shift scheduling and excessive criticism of the quantity and quality of the individuals' work. These pressures evidently reached a critical point for claimant on the day he learned of his shift change. He went home in a state of acute depression with violent feelings of hostility about Captain B.J. That condition persisted for some time. Claimant did not return to work as a deputy sheriff. Eventually, he turned to selling real estate, which he had done earlier in his career.

"A psychiatrist testified at the hearing that claimant suffered from anxiety and depressive neurosis directly related to his job as deputy sheriff, as a result of the perceived vendetta and the natural stresses of the job. No psychiatrist consulted found otherwise, and there was no evidence of stress outside the job that was a contributing cause of claimant's condition." *McGarrah v. SAIF,* 59 Or App 448, 450-51, 651 P2d 153 (1982).

The Court of Appeals found it to be "clear that the events about which claimant complains did, in fact, occur," and that:

"* * * [claimant did prove] that supervisory action and criticism relating to his performance on the job, to which he was not ordinarily subjected or exposed other than during a period of regular employment, was the major source of stress triggering his psychological disability.

"* * * Both the medical and other evidence establish that job-related stress caused claimant's mental disorder." *Id.* at 457-58.

It seems that no problem in recent years has given courts and commissions administering workers' compensation more difficulty than on-the-job mental stress which

results in either emotional or physical illness.[1] The causal relationship between employment stress and a resulting mental or emotional disorder presents one of the most complex issues in workers' compensation law.[2]

To understand the difficulty the courts have encountered in trying to resolve mental stress cases, one need only review selected cases from other jurisdictions,[3] which vary widely in their treatment of these claims. Of course, a great deal of the variance results from different wording in state statutes.

One well known case from another jurisdiction is *Carter v. General Motors Corp.*, 361 Mich 577, 106 NW2d 105 (1960). The Supreme Court of Michigan in *Carter* viewed mental disabilities as being identical to physical disabilities and sustained a compensation award for a psychosis resulting from cumulative emotional pressures suffered on the job by an assembly line worker. The court sustained the award despite the fact that the employe had considerable emotional difficulties in his background and his job involved no extraordinary stress, hazardous condition or identifiable risk of employment. The court rejected the contention that a traumatic event be required in mental disease cases to insure that the disease is work-related.

The claimant in *Carter* worked on a hub assembly job at defendant's automobile manufacturing plant. Claimant's work required him to take an assembled hub from a table to his workbench, "remove burrs with a file, * * * grind out holes in the assembly with a drill, and place the assembly on a conveyor belt." Claimant could not "keep up with the pace of the job unless he took 2 assemblies at a time to his workbench." *Id.* at 580. His foreman, however, repeatedly instructed him against this because the assembly parts became mixed on the conveyor belt. Although claimant attempted to keep up with the job for fear of layoff if he failed,

---

[1] *See* Note, *Emotional Stress—Now a Cause of Compensable Injury?*, 34 La L Rev 846 (1974).

[2] *See* Joseph, *The Causation Issue in Workers' Compensation Mental Disability Cases: An Analysis, Solutions, and a Perspective*, 36 Vanderbilt L Rev 263, 289 (1983).

[3] *See* Annot., *Mental Disorders as Compensable Under Workmen's Compensation Acts*, 97 ALR3d 161; Note, 66 Minn L Rev 1194 (1982); and Joseph, 34 La L Rev at 851, *supra*.

he continued to fall behind the pace and to mix up the assembly parts. Consequently, his foreman berated him. As a result of the employment dilemma, claimant suffered an emotional collapse diagnosed as paranoid schizophrenia and a residual type schizophrenic reaction.

The issue in *Carter* was the compensability of a mental disorder when the disorder allegedly was caused by "emotional pressures * * * not * * * unusual in any respect,— that is, not shown * * * to be any different from the emotional pressures encountered by * * * fellow workers in similar employment." *Id.* at 585. The court stated that Michigan law did not compel limiting recovery in a mental disability case to fact situations in which the claimant suffered a single physical injury or a single mental shock. The court added that claimant's mental collapse brought on by gradual mental stimuli was compensable. The court then granted claimant recovery because the record revealed that his disability arose out of the pressures of his work.

The *Carter* court articulated as the policy rationale for its conclusions that the basic purpose of the workers' compensation system compelled that a worker disabled as a result of work-related mental stress receive treatment identical to a worker disabled by a work-related physical injury.

In *Baker v. Workmen's Comp. Appeals Bd.*, 18 Cal App 3d 852, 96 Cal Rptr 279 (1971), the California appellate court adopted the *Carter* approach, reasoning that the claimant was suffering from a psychoneurotic syndrome described as "cardiac neurosis" which was caused by the pressures, dangers, and general conditions of his work as a fireman. The court annulled a decision of the Workmen's Compensation Appeals Board which had denied compensation. Finding no evidence that the claimant was feigning his symptoms of severe chest pains, shortness of breath, intermittent expectoration of blood and mucus, and cyanosis, and observing substantial evidence supporting the board's determination that he did not have heart disease or a disabling pulmonary disorder, the court said the only logical inference was that he suffered from a psychoneurotic syndrome. The court added that the claimant's testimony concerning the origin and progression of his symptoms, together with expert medical evidence, led to a clear inference of industrial causation. It

reasoned that psychoneurosis caused by the work environment was compensable, even in the absence of a physical accident or trauma, and even if the mental disorder resulted from the cumulative effect of daily stresses and strains.

In *Royal State Nat'l Ins. v. Labor Bd.,* 53 Hawaii 32, 487 P2d 278 (1971), the Hawaii Supreme Court upheld an award of compensation benefits to claimant, who was employed by an insurance company as director of agent training. Medical evidence showed that the pressures of his work resulted in his mental collapse and the physicians diagnosed the condition as schizophrenia with suicidal tendencies. Taking the position that a person may succumb to the pressures of work even though he is not under any unusual exertion or strain, the court noted no conflict in the evidence that the cause of the claimant's mental collapse was the pressure of his work. The court concluded with this thoughtful analysis:

> "* * * In today's highly competitive world it cannot be doubted that people often succumb to mental pressures resulting from their employment. These disabilities are as much a cost of the production process as physical injuries. The humanitarian purposes of the Workmen's Compensation Law require that indemnification be predicated not upon the label assigned to the injury received, but upon the employee's inability to work because of impairments flowing from the conditions of his employment. * * *" (Footnote omitted.) *Id.* at 38.

In *Yocom v. Pierce,* 534 SW2d 796 (Ky 1976), the Kentucky court upheld a compensation award for a claimant who suffered a non-traumatic work-related anxiety neurosis in the course of her employment by a clothing manufacturer. The court found the demands made by her job, which required her to match threads with the dominant color of garments, aroused a dormant condition into a disabling reality.

In *Deziel v. Difco Laboratories, Inc.,* 403 Mich 1, 268 NW2d 1, 97 ALR3d 121 (1978), the Michigan court continued its allegiance to *Carter,* and determined that workers' compensation benefits had been improperly denied to the claimant, McKenzie, an employe of an automobile manufacturer, who suffered a disabling mental disorder which he believed was caused by the pressures of his job. Compensation benefits had been denied on the ground that claimant's job, when viewed

objectively, had not aggravated, accelerated or combined with a long-standing personality defect from which he suffered to produce his disability. Evidence showed that assembly line workers took defective parts from claimant's work area and installed them on new automobiles, thus causing the claimant to worry about the safety of the cars, recount the remaining parts and account for those that were missing. The court reasoned that the medical evidence as to the claimant's perception of the cause of his mental disorder satisfied the subjective standard, and that it was a sufficient basis upon which to award compensation benefits.

In contrast to the decisions from Michigan, California, Hawaii and Kentucky, other jurisdictions refuse to allow any recovery in cases of mental disorders brought on by the stress of gradual strain and worry. These decisions represent the "[H]ow could it be real when * * * it was purely mental?" judicial reasoning criticized by Professor Larson in his article, *Mental and Nervous Injury in Workmen's Compensation,* 23 Vand L Rev 1243 (1970). He wrote:

" '[H]ow could it be real when * * * it was purely mental?'

"This poignant judicial cry out of the past, which I occasionally quote to put down my psychiatrist friends, contains the clue to almost all of the trouble that has attended the development of workmen's compensation law related to mental and nervous injuries. This equation of 'mental' with 'unreal,' or imaginary, or phoney, is so ingrained that it has achieved a firm place in our idiomatic language. Who has not at some time, in dismissing a physical complaint of some suffering friend or relative, airily waived the complaint aside by saying, 'Oh, it's all in his head?'

"The impact of this pervasive preconception on compensation decisions can be briefly stated. A high proportion of the cases display a search for something—anything—that can be called 'physical' to supply the element of 'reality' in the injury. If the courts find this element, they are quite happy to award compensation even though the injury viewed as a whole is preponderantly mental or nervous. But if no such 'physical' component can be identified, even some of the more sophisticated appellate courts still find themselves unable to justify compensation for a work-connected mental or nervous disability."

For cases representing this restrictive point of view, *see Transportation Ins. Co. v. Maksyn,* 580 SW2d 334 (Tex 1979);

*Marable v. Singer Business Machines,* 92 NM 261, 586 P2d 1090 (1978); *Erhart v. Great Western Sugar Co.,* 169 Mont 375, 546 P2d 1055 (1976); *Vernon v. Seven-Eleven Stores,* 547 P2d 1300 (Okla 1976); *Begin's Case,* 354 Mass 594, 238 NE2d 864 (1968); *Samson v. Southern Bell Telephone & Telegraph Co.,* 205 So 2d 496 (La App 1967); and *Jacobs v. Goodyear Tire & Rubber Co.,* 196 Kan 613, 412 P2d 986 (1966).

A less restrictive test for mental stress cases is found in decisions from Wisconsin, Arizona and Maine.

The Supreme Court of Wisconsin directly confronted the threshold policy limitations in gradual stress mental disability cases in *School District No. 1 v. Department of Industry, Labor & Human Relations,* 62 Wis 2d 370, 215 NW2d 373 (1974). In that case, claimant, a high school guidance counselor, was given a list of recommendations by the school's student council which requested the removal of several staff members and other changes. The counselor's copy of this list was difficult to read and she did not learn until after questioning students that the list recommended her removal from the staff. The counselor became emotionally upset about this recommendation; she was unable to sleep or eat and suffered nausea, severe headaches and acute anxiety. The counselor alleged that the incident with students caused her condition, which doctors diagnosed as a "severe neurosis tension state with gastro intestinal signs and symptoms." *Id.* at 372.

The court began its analysis by declaring that the Wisconsin Workers' Compensation Act clearly did not intend to limit recovery to physical injuries and traumatically caused mental injuries. That court adopted a standard under which mental disorders, not resulting from trauma, must arise from "a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience." Applying this test, the court denied claimant compensation on the ground that her experience "could not be deemed" different from "the countless emotional strains and differences that employees encounter daily." *Id.* at 377-78.

In two cases, the Supreme Court of Arizona established a standard that stress encountered by the claimant at work must be greater than that ordinarily encountered by employes performing the same type of work: *Fireman's Fund*

*Ins. Co. v. Industrial Com'n,* 119 Ariz 51, 579 P2d 555 (1978), and *Sloss v. Industrial Commission,* 121 Ariz 10, 588 P2d 303 (1978).

In *Fireman's Fund,* claimant's mental disorder allegedly resulted from constant, psychologically intolerable work responsibility. The claimant was an underwriter for defendant's insurance agency. Within a short time of her arrival, the agency experienced a period of explosive growth. Claimant, "a conscientious employee and a perfectionist," undertook duties that placed her "under constant pressure." The defendant agency purchased another agency and added another employe. The agency made claimant the supervisor of the new employe and gave her responsibility for merging the books of the two agencies. Claimant began to feel frustrated and ineffective and experienced difficulty relating to her co-workers. After a severe emotional outbreak, she was hospitalized for a mental breakdown. Claimant alleged that she suffered a disabling mental condition brought on by the gradual build-up of the stress and strain of her employment.

The claimant in *Sloss* was a highway patrolman who suffered from a condition doctors diagnosed as "chronic anxiety." Claimant alleged that his condition developed from the pressures of his work. The administrative law judge, without the benefit of the decision in *Fireman's Fund,* denied recovery because the "stresses to which [claimant] was exposed in his employment were [the] same as, and no greater than, those imposed upon all other highway patrolmen in [the] same type of duty." *Sloss,* 588 P2d at 303-04. The Arizona Supreme Court approved this decision, adding that under *Fireman's Fund* a showing of more than ordinary and usual work-related stress was necessary.

The Supreme Judicial Court of Maine in *Townsend v. Maine Bureau of Public Safety,* 404 A2d 1014 (Me 1979), expressly adopted the standard that on-the-job stress must be greater than found in employment generally. The claimant, Ms. Townsend, was employed as a civilian dispatcher with the Department of Public Safety from June of 1973 until March of 1976. After being reprimanded by her supervisor on March 18, 1976, for an infraction of the Department's rules, Ms. Townsend became emotionally distraught and left work early that day. Suffering from what the claimant described as a "nervous

breakdown," she thereafter voluntarily entered the hospital where she remained for approximately four weeks suffering from a "situational reaction" with depression.

The claimant testified she was subjected to work-related "harassment" beginning in the winter of 1973 due to a relationship she had with a state police officer which the Department attempted to discourage. She related a series of incidents in which she was followed, received annoying telephone calls and was summoned to court, all perpetrated by Department employes who were out to get her. Ms. Townsend stated that even after the relationship ended she was exposed to repeated and unjustified disciplinary hearings and suspensions until she was no longer able to cope with her job.

Justice Delahanty, writing for the court, said:

"It is clear that this Court has never found talismanic the physical-mental dichotomy for purposes of our workers' compensation law. * * *

"If both physical trauma leading to mental injury and mental stimulus leading to physical injury would be compensable, it would follow that mental stimulus leading to mental injury would come within the reach of our Act. * * *" *Id.* at 1016.

And concluded:

"In sum, where there is a sudden mental injury precipitated by a work-related event, our typical workers' compensation rules will govern. Where, however, the mental disability is the gradual result of work-related stresses, *the claimant will have to demonstrate either that he was subjected to greater pressures and tensions than those experienced by the average employee or, alternatively, by clear and convincing evidence show that the ordinary and usual work-related pressures predominated in producing the injury."* (Emphasis added; citations omitted.) *Id.* at 1020.

The court expressly stated the policy reason for its adoption of the limiting threshold standard: "[A] higher threshold level than simply the usual and ordinary pressures that exist in any working situation would erect an appropriate buffer between the employer and a host of malingering claims." *Id.* at 1019.

The Maine court's analysis reveals an underlying methodology to counterbalance the policy problems that emanate from the subjective nature of mental injuries by providing an objective measurement.

We now review some Oregon cases dealing with the issue of on-the-job mental stress causing physical disease or mental disorders.

In 1969, this court in *Clayton v. Compensation Department,* 253 Or 397, 454 P2d 628 (1969), held that a heart attack resulting from ordinary on-the-job stress conditions was compensable. No special tests were set forth in the opinion to aid us in determining when mental disorders arising from on-the-job stress are compensable. However, the court demonstrated no reluctance to approve compensation for a physical illness arising from on-the-job stress.

In *Paresi v. State Accident Insurance Fund,* 44 Or App 689, 606 P2d 1172 (1980), *remanded on other grounds* 290 Or 365, 624 P2d 572 (1981), a liquor control officer observed what she perceived were illegal activities on the part of the Oregon Liquor Control Commission involving preferential treatment accorded certain licensees. Her activities brought her into conflict with her supervisors. She in turn perceived her supervisors' criticism of her as harassment and became anxious and depressed. The Court of Appeals allowed her disability benefits and commented that emotional disorders need not be analyzed objectively and that employers must accept workers as they find them with all their latent and obvious physical and mental deficiencies.

In *Korter v. EBI Companies, Inc.,* 46 Or App 43, 610 P2d 312 (1980), an insurance claims consultant was demoted at work and became anxious, insecure and depressed. The Court of Appeals found that the worker proved he was disabled and his disability arose out of and in the course of his employment. With regard to causation, the Court of Appeals set out the following principles from its decision in *James v. SAIF,* 44 Or App 405, 409-12, 605 P2d 1368 (1980):

> "(1) the mental disorder does not have to be the result of an extraordinary unanticipated event; it can result from the cumulative effects of each day's exposure to specific conditions at work;

"(2) the conditions of employment, claimed to be the precipitating cause of the mental disability, do not have to be unusual; the disability is compensable if it results from the usual and ordinary job stress; and

"(3) the claim is compensable even if the individual has a preexisting emotional disorder if he proves that his work activity and conditions caused a worsening of his underlying disease resulting in an increase in pain to the extent that it produces disability or requires medical services." *Korter,* 46 Or App at 50.

On review, we noted in *James v. SAIF,* 290 Or 343, 624 P2d 565 (1981), that the claimant complained she was being unfairly reprimanded and criticized by her supervisor, from which she developed a nervous disorder. The claimant suffered from anxiety and depression neuroses. We held such a claim would be compensable if the claimant's mental disorder was caused by circumstances "to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment." We specifically said that claimant's mental illness, neuroses, was an occupational disease.

In *James* the evidence indicated that the claimant's mental illness was caused by criticism from her supervisor to which the claimant was subjected and exposed only during employment. However, the evidence also showed that it was not the source of the criticism, but any criticism or unsympathetic or unfriendly conduct from any source that was stressful to the claimant. We found that there was a fact question whether the claimant's mental disorder was caused by circumstances "to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment." The case was remanded to the Court of Appeals for a factual finding on that issue and the court subsequently found that the claimant's mental disorder was work related and granted compensation. *SAIF v. James,* 61 Or App 30, 33, 655 P2d 620 (1982).

The decision in *James* left unanswered the major question whether and under what circumstances our occupational disease statute provides compensation for mental disorders emanating from on-the-job mental stress. In *James,* SAIF did not contend that mental illness was never compensable. Without addressing this key issue, this court in *James* merely set forth a rule to apply in mental stress cases — that

the claimant's mental disorder must be caused by circumstances "to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment." 290 Or at 351. This issue is now squarely before us.

The adoption of the "restrictive" rule is suggested by the employer in the companion case of *Leary v. Pacific Northwest Bell.* In a memorandum to this court, Pacific Northwest Bell asserts:

"'The statutory definition of occupational disease does not contain any language which even suggests that worsened symptoms of mental disorders should be compensable while worsened symptoms of physical disease should not. In fact, the only provision of the occupational disease law which makes the mental/physical distinction in any form indicates that the legislature never intended to provide compensation for mental disorders at all. ORS 656.806 provides:

'As a prerequisite to employment in any case, a prospective employer may, by written direction, require any applicant for such employment to submit to a *physical* examination by a doctor to be designated by the Director of the Workers' Compensation Department, and paid by such prospective employer. * * *' (Emphasis added.)

"Under the authority of this provision, a prospective employer can attempt to identify and screen out those employees who suffer from physical diseases which could be exacerbated by the specific working environment. No such method is authorized for identifying prospective employees who suffer from mental disorders which could become worse as a result of stress they are likely to encounter on the job.

"It may be that this court would refuse, in light of cases previously decided, to now consider a contention that mental disease is not compensable under the occupational disease law. It does not appear that that argument has ever been squarely presented. *See, e.g., James v. SAIF, supra,* 290 Or at 346 ('SAIF does not contend that mental illness can never be compensable.'). The argument was not made to the Court of Appeals in this case.

"Nevertheless, given the legislature's express focus on physical conditions in the provisions of the occupational disease law, it certainly cannot be said that there is any warrant for providing compensation associated with mental disease under circumstances where the law does not authorize compensation related to physical disorders."

The Court of Appeals, in the companion case of *Leary v. Pacific Northwest Bell,* 60 Or App 459, 653 P2d 1293 (1982), rejected this contention and held that in order to qualify for a compensation award for a physical disorder the claimant would be required to prove only that the stress arose out of and in the course of the employment and that the employment-connected stress suffered by the claimant was the major contributing cause of the claimant's mental disorder. Such a test is backed by the logic and reasoning expressed in *Carter* and allied cases.

Dissenters from such a rule argue that workers' compensation claims are already a substantial cost of doing business in any state[4] and that unless substantial restrictions are placed upon mental stress and disorder claims the entire scheme of workers' compensation will be threatened to the extent that its original purpose will be defeated. Justice Coleman of the Michigan Supreme Court in his dissenting opinion in *Deziel v. Difco Laboratories, Inc.,* 403 Mich 1, 61-62, 268 NW2d 1, 27 (1978), expressed his concerns about the economic effect the decision could have on that state:

> "There is no doubt that the decision today will be a costly burden to Michigan employers, small and large, who compete with out-of-state business and to the consumers who absorb those costs. The concern here expressed, however, is not only for employers and consumers but for employees. We have engaged in a seemingly inexorable march towards limiting the hiring of workers to only those persons in the top echelon of physical and mental condition.

> "While workmen's compensation costs are burgeoning, the benefits must be spread ever more thinly among the workers to accommodate new categories of disorders (and ever more remote accidents) which cannot be guarded against or controlled by an employer. Moreover, when businesses close or move to another state, jobs and tax revenues are lost. When expansions of existing businesses are taken to other states, Michigan residents lose opportunities for employment. These economic facts of life should not be overlooked when we expand legislation by judicial fiat.

> "We do no service to the people of Michigan with this open-door opinion * * *." 268 NW2d at 27.

---

[4] The total premiums paid for workers' compensation in Oregon for fiscal year 1982-83 was $330 million.

It is not our task to rely on supposed economic disasters that might befall this state in deciding to adopt one rule versus another. If a legislature chooses to open the door of its workers' compensation law for all mental stress cases it is free to do so. If it chooses to eliminate all mental stress claims for workers' compensation, it may do so. A legislature may wish to consider the scholarly work and suggestion for a "worker's disease protection system" which would substantially and structurally reform the present methods of compensation for mental disorders and resulting disabilities.[5]

Workers' compensation systems are founded on political compromise. For decades, labor, management and the insurance industry in this state have waged fierce political wars over who receives what and when. Legislatures first enacted workers' compensation laws early in this century in response to an increase in industrial accidents and because of the inadequate recovery provided employes under common law doctrines and procedures.[6]

 Workers' compensation laws provide a form of strict liability requiring employers, regardless of fault, to compensate employes for injuries arising out of and in the course of employment.[7] In exchange for that relief under this no-fault

---

[5] This interesting proposal is set forth by attorney Lawrence Joseph of the New York Bar in his challenging law review article: *The Causation Issue in Workers' Compensation Mental Disability Cases: An Analysis, Solutions, and a Perspective*, 36 Vand L Rev 263 (1983).

[6] In upholding the constitutionality of Oregon's original workers' compensation law, this court recognized that trade off in *Evanhoff v. State Industrial Acc. Com.,* 78 Or 503, 523-24, 154 P 106 (1915):

"* * * Before its enactment one workman out of three received a large compensation for his injuries by an action at law, while the remaining two were defeated and got nothing. Now every workman accepting its provisions receives some compensation if injured; and, taken as a whole, it will be found that more money in the way of compensation is received by the whole body of injured workmen than by the inadequate remedies afforded in the courts. It has been a boon to the employers, the employed, and the community, which latter could formerly only offer to the injured laborer the charity of the almshouse instead of that just compensation which he may now receive without the humiliation of pauperism or the loss of self-respect."

[7] ORS 656.012(2) provides in pertinent part that:

"* * * the objectives of the Workers' Compensation Law are declared to be as follows:

"(a) To provide, regardless of fault, sure, prompt and complete medical treatment for injured workers and fair, adequate and reasonable income benefits to injured workers and their dependents; * * *"

recovery system, employes are limited to a fixed schedule of recovery and must abandon any common law right of action against their employers. The theory underlying workers' compensation acts is that the financial burden of losses due to injuries occurring in business should be treated as business expenses or production costs to be borne, not by the employe, but by the employer, who can transfer the burden to the consumer. Our current occupational disease law is based on the same social and economic concerns.

Those ultimate social and economic decisions are for the legislature and not for the courts. The courts must decide whether an occupational disease is compensable based on legislative directives.

The intention of the Oregon legislature was manifested when it enacted Oregon's occupational disease law. The law was designed to provide protection only for any disease or infection which arises out of and in the scope of employment and "to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment." ORS 656.802(1) defines an occupational disease as follows:

"As used in ORS 656.802 to 656.824, 'occupational disease' means:

"(a) Any disease or infection which arises out of and in the scope of the employment, and *to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein.*

"(b) Death, disability or impairment of health of fire fighters of any political division who have completed five or more years of employment as fire fighters, caused by any disease of the lungs or respiratory tract, hypertension or cardiovascular-renal disease, and resulting from their employment as fire fighters." (Emphasis added.)

Professor Larson comments about statutory definitions which are common in occupational disease cases. He states in his treatise on workers' compensation law:

"A number of statutes contain detailed definitions of the term 'occupational disease,' and these statutory definitions give the clue to the distinction which is controlling for present purposes. The common element running through all is that of the distinctive relation of the particular disease to the nature

of the employment, as contrasted with diseases which might just as readily be contracted in other occupations or in everyday life apart from employment. * * *" 1B Larson, Workmen's Compensation Law § 41.32, p 7-361 (1979).

The vast majority of workers, if not all, face and deal with job stress on a daily basis. The Oregon occupational disease statute speaks of diseases the worker is exposed to on the job, but not ordinarily exposed to off the job. On-the-job stress is not a disease. On-the-job events and conditions produce stress which in turn can cause mental disorders. We recognize that if we conclude the occupational disease law allows compensation for mental diseases and disorders caused by on-the-job stressful events or conditions, that interpretation of the statute may open a floodgate of claims from workers who simply cannot mentally cope with usual working conditions.[8] Researchers tell us that people who suffer from psychological problems occupy more hospital beds in the United States than those who have a physical illness or injury. It is estimated that at any given time between 15 and 30 percent of the general population have diminished efficiency as a result of some type of mental or emotional dysfunction.[9] The legislature must have been aware of the shift in costs from general welfare or general insurance to workers' compensation that would occur if workers' compensation provided coverage for mental and physical disorders caused by job stress. We find no legislative words nor any evidence of legislative intent to indicate that the legislature either intended or did not intend to place that burden on the workers' compensation system.

If the legislature wants employers and compensation carriers to be relieved from the burden of such claims and wishes to change the occupational disease law to exclude

---

[8] Some commentators and courts assume the reason to exclude disorders resulting from on-the-job stress conditions is to avoid fraudulent claims, but we do not agree with that assumption. On the contrary, we presume most mental stress claims are made in good faith. *See* 1B Larson, Workmen's Compensation Law § 42.23(b); Joseph, 36 Vand L Rev at 291 n 113, *supra* at nn 2 and 5; Comment, *Workers' Compensation for Mental Disabilities Resulting from Protracted Stress,* 17 Will L Rev 693, 702 n 65 (1981).

[9] *See* P. Carone, S. Kieffer, L. Krinsky and S. Yolles, The Emotionally Troubled Employee: A Challenge to Industry 57 (1976), cited in Note, *When Stress Becomes Distress: Mental Disabilities Under Workers' Compensation in Massachusetts,* 15 New Eng L Rev 287, 304 (1980).

mental disorders, such as exhaustively set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3rd Ed 1981),[10] then the legislature can amend the statute to exclude specifically compensation for mental or physical disorders arising from job stress events and conditions. As we have said, this is a judicial body, not a legislative body, and we refuse to make, by judicial intervention, such a major conversion of our legislature's workers' compensation occupational disease act.

■ We agree with the Hawaii Supreme Court's analysis in *Royal State Nat'l Ins. v. Labor Bd.*, 53 Hawaii 32, 487 P2d 278 (1971), that stress-caused claims for benefits arising out of mental and physical disorders are compensable if they flow from the conditions of the worker's employment, provided causation, as hereinafter discussed, has been proven. We all

---

[10] This 494-page work was compiled by many prominent psychotherapists. One group was called the "Task Force on Nomenclature and Statistics." The term "disease" is not used as an accurate diagnostic assessment. However, the term "mental disorders" is the constant classification reference. The Diagnostic and Statistic Manual-III (DSM-III) attempts to describe comprehensively what the manifestations of the mental disorders are, and only rarely attempts to account for how the disturbances came about. DSM-III contains a glossary of terms. The words "mental disease" are not defined.

The World Health Organization developed a separate chapter for mental disorders in its Ninth Revision of the International Classification of Diseases (ICD-9), thereby distinguishing Mental Disorders from Infectious Diseases, Diseases of the Blood, Diseases of the Nervous System, and the like.

If the legislature chooses to include mental disorders within the definition of occupational diseases, it might observe that DSM-III defines, among hundreds of other mental disorders, the following:

> Attention deficit disorders - hyperactivity
> Conduct disorder - unsocialized, aggressive
> Stuttering
> Alcoholism
> Cocaine intoxication
> Amphetamine intoxication
> Cannibis intoxication
> Tobacco withdrawal
> Caffeine intoxication
> Paranoid disorders
> Neurotic disorders, including anxiety
> Affective disorders, including depression
> Somatoform disorders, including hypochondriasis
> Psychogenic amnesia
> Psychosexual dysfunctions, including inhibited sexual desire.

The manual also includes codes not attributable to a mental disorder. Listed are V.62.20 Occupational problems and V.65.20 Malingering.

know that stress may flow from work conditions. However, the on-the-job stress conditions causing the disorders must be real. That is, the events and conditions producing the stress must, from an objective standpoint, exist in reality. A worker's inability to keep up the pace of the job, *Carter v. General Motors Corp.*, 361 Mich 577, 106 NW2d 105 (1960), is real stress. Pressures, dangers and general conditions of a fire fighter's work are real stress, *Baker v. Workmen's Compensation Appeals Board,* 18 Cal App 3d 853, 96 Cal Rptr 279 (1971). The pressure of an executive or management position is real stress, *Royal State Nat. Ins. Co., supra.* The day-after-day intricate matching of threads in a garment factory is real stress, *Yocom v. Pierce,* 534 SW2d 796 (Ky 1976). However, concern that cars might not be safe, emanating from a worker's long-standing personality defect, when there is no objective evidence to substantiate such a fear, is not real stress, *Deziel v. Difco Laboratories, Inc.,* 403 Mich 1, 268 NW2d 1 (1978). A worker's misperception of reality does not flow from any factual work condition. We disagree with the Michigan Supreme Court standard set forth in *Deziel* that all that is needed for compensation for stress-induced physical disease or mental disorders is a strictly subjective causal nexus based upon a worker's honest perception. A worker may honestly believe that the employer plans to kill him and as a result of that fear cannot work, but if that belief emanates only from the worker's own paranoia and there was no evidence the employer had any such plan, no stress condition factually existed on the job and the resulting impairment would not be compensable. On the other hand, a worker with a non-disabling paranoid personality may lapse into a totally disabling psychotic paranoia if managers pile too heavy a workload on such a susceptible employe. Honest perception exists in both cases, but workers' compensation would be properly denied in the first case and properly allowed in the second.

Under a "strictly *subjective* causal nexus" standard, a claimant is entitled to compensation if it is factually established that claimant *honestly perceives* some event occurred during the ordinary work of his employment which "caused" his disease. This standard applies where the claimant alleges a disease resulting from mental stimulus and honestly, even though mistakenly, believes that he is disabled or impaired

due to that work-related event and therefore cannot resume his normal employment.

■ This standard is no standard at all in the reality of application. In cases where the disability or impairment is established, the subjective test for causal nexus would result in an award of compensation for virtually all, if not all, claims based on mental disorders. If the claimant perceived that the job conditions caused the mental disorders, *even if this were not true,* the employer would be liable. The subjective formulation ignores the fundamental statutory requirement that diseases or disorders arise out of and in the scope of employment. An honest perception of that which does not factually exist is an insufficient causal nexus for an occupational disease claim.

The stressful conditions must actually exist on the job.[11] That is, they must be real, not imaginary. The views of an average worker or average person or the perceptions by the claimant may be relevant, but are not determinative. The existence of legal cause of stress-related occupational disease must be determined objectively.[12]

In the present case, the Court of Appeals found that there were actual stress conditions at work, not simply conditions perceived by the claimant in his own subjective view.[13]

---

[11] *See* Dr. Colbach's comments as set out in in *Leary v. Pacific Northwest Bell,* 296 Or 139, 675 P2d 157 (1983).

"It doesn't appear that his work has forced him into any particularly stressful situations. But his selective perceptions of what is going on at work do cause him distress * * *." (Slip op at 2-3.)

It was most helpful to this court in the present case that the Court of Appeals made specific findings of fact rather than merely referring to the testimony of the witnesses. It was most difficult in *Leary v. Pacific Northwest Bell,* 60 Or App 459, 653 P2d 1293 (1982), to distinguish a finding of fact from a mere recitation of testimony.

[12] We hasten to point out that this objective test for stress does not inject an element of fault into the Workers' Compensation Law. The evidence in cases of this kind has nothing to do with legal blame or fault. The appropriate findings should address whether the circumstances are in fact stressful, irrespective of fault. The fact that a worker is mentally ill usually is due to no fault of his own. Also, the fact that a worker misconceives reality is usually due to no fault of his own. If an employer hires stress-causing supervisors, that situation can be avoided, just as safety measures can be installed to prevent accidents, but that does not convert stress problems into "who is at fault" problems, which as mentioned have no place in the Workers' Compensation Law.

[13] The objective test is criticized by Joseph, 36 Vand L Rev at 311, *supra* at nn 2 and 5.

The worker proved stressful conditions, viewed objectively, existed on the job.

■ In addition to proving that stressful conditions objectively existed on the job, the worker must also prove that employment conditions, when compared to non-employment conditions, were the "major contributing cause" of the mental disorder. In *Dethlefs v. Hyster Co.*, 295 Or 298, 310, 667 P2d 487 (1983), we said:

> "* * * [I]f a causative agent at the work place and a causative agent away from the work place are different in kind and concur to cause an indivisible disease which requires medical services or causes disability, a claim therefor is compensable if the causative agent at the work place is the major cause of the disease."

We agree that ORS 656.802(1)(a) does not require that the occupational disease be caused or aggravated *solely* by the work conditions. If the at-work conditions, when compared to non-employment exposure, are *the major contributing cause* of the claimant's disease or disorder, then the claimant is eligible for compensation. The Court of Appeals found this claimant suffers a greater and different degree of stress when he is at work. That court further found no evidence this claimant suffered from any particular stress from non-employment sources.

■ Applying the facts as found by the Court of Appeals to the standards set forth in this case, we hold that this occupational disease is compensable. Claimant was subjected to actual stress conditions at work when viewed objectively. Furthermore, the at-work conditions, when compared to non-employment exposure, were the major contributing cause of claimant's mental disorder.

The Court of Appeals is affirmed.

**LENT, J.,** concurring.

I write separately only to express what I perceive to be the thrust of the opinion of the court. "Stress" is not the disease. It is a word which describes the mechanism by which conditions or events actually present at the work place result in mental disease.

An occupational disease is considered an injury except as otherwise provided in the Occupational Disease Law, ORS 656.804. As such, the disease may be a nondisabling compensable injury if it requires medical services only, ORS 656.005(8)(c), or a disabling compensable injury if the disease results in disability or death, ORS 656.005(8)(b).

If conditions or events actually present at the work place are the major contributing cause of a mental disease necessitating medical services or resulting in disability, the worker is entitled to compensation as defined in ORS 656.005(9) under the Occupational Disease Law.