Argued and submitted October 28, 1983, reversed and
remanded with instructions February 22, reconsideration denied April 27,
petition for review allowed May 22, 1984 (297 Or 227)
See 298 Or 429, 693 P2d 641 (1985)

In the Matter of the Compensation of
Olive J. Elwood, Claimant.

ELWOOD,
*Petitioner,*

*v.*

STATE ACCIDENT INSURANCE FUND
CORPORATION,
*Respondent.*

(80-10264; CA A27555)

676 P2d 922

Thomas A. Huntsberger, Springfield, argued the cause for petitioner. With him on the briefs was Ackerman, DeWenter & Huntsberger, Springfield.

Darrell E. Bewley, Appellate Counsel, State Accident Insurance Fund Corporation, Salem, argued the cause and filed the brief for respondent.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

■    In August, 1980, claimant filed a claim for occupational disease based on depression. ORS 656.802.[1] The referee and Workers' Compensation Board affirmed the insurer's denial of the claim. We reverse and remand.

In *McGarrah v. SAIF*, 296 Or 145, 164, 675 P2d 159 (1983), the court stated:

"[T]he on-the-job stress conditions causing the disorders must be real. That is, the events and conditions producing the stress must, from an objective standpoint, exist in reality. A worker's inability to keep up the pace of the job is real stress. * * * The pressure of an executive or management position is real stress. * * *

"* * * A worker may honestly believe that the employer plans to kill him and as a result of that fear cannot work, but if that belief emanates only from the worker's own paranoia and there was no evidence the employer had any such plan, no stress condition factually existed on the job and the resulting impairment would not be compensable. On the other hand, a worker with a non-disabling paranoid personality may lapse into a totally disabling psychotic paranoia if managers pile too heavy a workload on such a susceptible employe. Honest perception exists in both cases, but workers' compensation would be properly denied in the first case and properly allowed in the second.

"* * * * *

"The stressful conditions must actually exist on the job. That is, they must be real, not imaginary. The views of an average worker or average person or the perceptions by the claimant may be relevant but are not determinative. The existence of legal cause of stress-related occupational disease must be determined objectively.

"* * * * *

"In addition to proving that stressful conditions objectively existed on the job, the worker must also prove that employment conditions, when compared to non-employment

---

[1] Occupational disease means:

"Any disease or infection which arises out of and in the scope of the employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein." ORS 656.802(1)(a).

conditions, were the 'major contributing cause' of the mental disorder."

*See also Leary v. Pacific Northwest Bell,* 296 Or 139, 675 P2d 157 (1983).

Under *McGarrah,* the questions are:

1. What were the "real" events and conditions of plaintiff's employment?

2. Were those real events and conditions capable of producing stress when viewed "objectively," even though an average worker might not have responded adversely to them?

3. Did plaintiff suffer a mental disorder?

4. Were the real stressful events and conditions the "major contributing cause" of plaintiff's mental disorder?

Claimant, age 54, was a registered nurse for 24 years. She worked full time for McKenzie Manor Home from 1966 until 1976. For the last nine years of that employment, she was the assistant director of nurses. She worked 40 hours a week with occasional week end or over-time work and rarely took vacations. She was responsible for a ward on one shift, including supervision of nurses and aides, medications for 75 patients and other administrative duties. She had frequent contact with visitors and patients' families, had to meet demands from patients and other nurses and had the responsibility of director of nurses if that person was away or ill.

The referee found claimant's testimony "essentially credible." Claimant testified that nurses made unnecessary phone calls to the doctor about patients under her general supervision, disobeyed her instructions, ignored her, lost respect for her and encouraged aides and orderlies to disrespect her, denigrated the quality of her nursing care to families of patients and told management about complaints of patients and their families about her work. She had numerous conflicts with other nurses during the last few years of her service. She also testified that drugs and alcoholic beverages used by the residents disappeared without explanation from her ward and that she was told by an aide two or three days after she was terminated that there were rumors at the Home that she had been drinking the patients' alcohol and taking drugs. Claimant believed that that was "devastating" to her reputation.

Claimant testified that, because she was the logical choice to become the new director of nursing, the director and the nurses were attempting to force her to quit. She also testified that the administrator admitted that claimant was "being run off," but the administrator denied that. Claimant said that the director of nurses told her that her impression that the nurses were "giving her a bad time" was "in her imagination."

Although claimant had received above average to outstanding annual performance evaluations, the insurer submitted evidence that her work performance began to decline in about 1974, that she had failed to keep adequate records and charts in conformance with state regulations and had been told of the deficiency, that she was disrespectful to the administrator and one of the physicians and that patients complained concerning the care they received from her.

The record does not disclose whether the employer or other nurses, in fact, wished to force claimant out, whether claimant's imagination led her to this perception or whether there was good cause for her termination. It is clear that the employer requested and received claimant's resignation on April 1, 1976. Although the employer denied that it was trying to force claimant out, it did not try to prove that the events on which claimant based her belief that people did not want her there were not real. The record shows that numerous events and conditions of the employment, including her termination, were real and capable of producing stress when viewed objectively. *See SAIF v. Shilling,* 66 Or App 600, 675 P2d 1081 (1984).

We also find that claimant suffers from a mental disorder. In the last five years of her employment, she developed frequent sore throats and gastric ailments. In the final two or three years, she became more tense and irritable and had numerous conflicts with other nurses. Her physician prescribed medications for her nervousness on an "as needed" basis. Her husband testified that for two or three years prior to her termination she was under great pressure, spent many restless nights and was reluctant to be left alone.

Claimant testified that, at the meeting at which her resignation was demanded, the director of nurses, the administrator and the owner told her that she was being terminated

in part because of her illness. Although the administrator testified that claimant's termination was the result of her failure to keep proper records, the employer listed the basis of termination on its form as "asked to resign as health didn't seem to be too good." The director of nurses wrote that claimant "was asked to resign because of inability in keeping up with workload which I feel was due to health reason." Claimant testified that one of the aides had told her that the director of nurses had "told the aides that next morning that I was emotionally ill and would not be returning to work."

In December, 1976, after her resignation, claimant's gynecologist believed that claimant was suffering from anxiety and depression. In early August, 1980, Dr. Smulowitz, claimant's treating physician, advised her that she was suffering from "anxiety and depression and stress" and that she should obtain a psychiatric evaluation. In April, 1981, Dr. Radmore found claimant "chronically depressed." Although Dr. Holland, another psychiatrist who examined her at the insurer's request, concluded in 1981 that claimant "does not at the present time have a significant or diagnosable mental illness,"[2] we find the psychiatrists who testified for claimant more convincing. The referee found that claimant suffered from "anxiety, tension and depression." We are not persuaded by the Board's conclusion that, because claimant did not seek psychiatric help until 1980, she did not have a mental disorder. She was not advised to seek psychiatric help until 1980.

We also find that real, stressful events and conditions of plaintiff's employment, including the termination, when compared to the non-employment exposure, were the major contributing causes of her mental disorder. The referee stated:

---

[2] Dr. Holland testified:

"* * * she has some symptoms which she admits are not related to her work experience which suggest that she has had emotional difficulty for a considerable period of time in her life."

He also noted:

"She was usually tense and jumpy with her period, she often became nervous and shakey when approached by a superior, she had been considered a nervous person, she comes from a shy and sensitive family and her feelings have been easily hurt and criticism has always upset her."

> "There is medical opinion which generally relates claimant's psychological state to her work and termination. The lay testimony of claimant and her other witnesses is essentially credible."

The referee, however, thought that the causes of her depression— "criticism of job performance and termination from the job"—were noncompensable acts of supervision, citing *Henry McGarrah*, 33 Van Natta 584A (1981). We reversed the latter decision in *McGarrah v. SAIF*, 59 Or App 448, 651 P2d 153 (1982), before the Board's decision here. The Board believed, however, that claimant's disability was not compensable, because claimant's depression resulted from the employer's act of termination and did not arise in the course and scope of employment. Here, the employer's termination of claimant was part of her work experience and an act of supervisory authority over her in the course and scope of her employment. *See also Weiland v. SAIF*, 64 Or App 810, 669 P2d 1163 (1983).

Although claimant had received psychiatric treatment in 1964 or 1965, the first diagnosis of "depression" was made by her gynecologist in December, 1976. In August, 1980, Dr. Smulowitz diagnosed claimant's depression and stated that it was causally related to her employment:

> "On the basis of the stress produced by her firing after 10 years of service after really no well established reasons the patient claims to be disabled on the basis of this pressure put on her and is unable to work at her nursing profession because of this anxiety and depression and stress caused by her being fired after 10 years on the job at McKenzie Manor nursing home."

In April, 1981, Dr. Radmore believed that claimant's depression was caused by her work and wrote:

> "Mrs. Elwood has experienced a significant blow to her ego which has persisted throughout the years since her initial firing from her job * * *."

Dr. Woodward wrote in July, 1981, that "there probably was a causal relationship between Mrs. Elwood's work and her depression."

Shortly after her termination claimant refused a part-time nursing position at another facility, because she felt she was no longer capable of working as a nurse. She has not

worked since her termination in April, 1976, and her nursing license has lapsed. Her home life was supportive, and she had functioned satisfactorily for many years as a full-time nurse in a responsible supervisory position. That she may have been more susceptible than the average worker to an occupational disease as a result of stress does not render her disease non-compensable. *SAIF v. Gygi,* 55 Or App 570, 639 P2d 655, *rev den* 292 Or 825 (1982); *see also McGarrah v. SAIF, supra.* Claimant's mental disorder is compensable.

Reversed and remanded with instructions to order acceptance of claim.