Argued and submitted January 31, affirmed April 23, 1986

In the Matter of the Compensation of
Lewis Yock, Claimant.

## GLOBE MACHINE,
*Petitioner,*

*v.*

## YOCK,
*Respondent.*

(WCB 84-00449; CA A36515)

717 P2d 1235

Jas. Adams, Portland, argued the cause for petitioner. With him on the brief was Mitchell, Lang & Smith, Portland.

Willard E. Merkel, Portland, argued the cause for respondent. With him on the brief was Galton, Popick & Scott, Portland.

Before Joseph, Chief Judge, and Van Hoomissen and Young, Judges.

JOSEPH, C. J.

## JOSEPH, C. J.

Globe Machine seeks review of a Workers' Compensation Board order which found that claimant's disabling psychological breakdown and alcohol abuse are the results of stress that he encountered while working for Globe and one of its subsidiaries. We affirm.

Claimant, who was born in 1930, was an engineer in the wood products industry for almost 30 years. In 1978, he left his employer of 20 years to become the part-owner of a corporation which operated a lumber mill in California. The recession began soon afterwards, and the mill was one of the early casualties; the corporation went bankrupt in 1979. After completing the liquidation, claimant went to work for Globe as an engineer, soon moving into a supervisory position. In July, 1981, Globe purchased Hildebrand North America, a manufacturer of dry kilns, and installed claimant as its president. He continued to report to Globe's president. Claimant soon discovered that Hildebrand's financial condition was almost hopeless; the company filed for reorganization in bankruptcy in September, 1981, and was eventually liquidated. Claimant remained as president through the liquidation and in that position had to deal with the pressures of laying off employes, cutting the pay of those who remained, fending off creditors, many of whom were his personal friends, and struggling to find some way for the company to survive. He worked 12- to 14-hour days, often seven days a week, for months at a time. He believed, with some reason, that a number of the Hildebrand employes were more loyal to the company's customers than to the company. He also found the uncertainties of managing a business to be significantly more difficult than had been his previous experience in managing engineering projects.[1]

Claimant had been a heavy drinker for many years before 1979; his drinking had affected his health. In 1972, he broke a rib during a drunken fight at a poker game. Beginning in 1974, he had a series of hospitalizations for pancreatitis, which his physicians related to his heavy consumption of

---

[1] Claimant testified that he did not experience similar stress with the failure of the mill he partly owned, because that failure was the result of the recession, not of anything he or his employes did or did not do. He therefore did not feel personally responsible for the failure.

whiskey.[2] They noted liver problems which seemed to decrease when he stopped drinking; one physician suspected cirrhosis. Over the years, claimant would stop drinking for a period and then begin again, with renewed drinking eventually resulting in a hospitalization.

In September, 1979, claimant was diagnosed as diabetic. His physician told him that he could not drink any more, and he stopped. According to his testimony, he did not drink again until July, 1982, a year after he became president of Hildebrand. For reasons we discuss in more detail below, we find that he did stop drinking in 1979, but that he began again in the fall of 1981, several months after taking over Hildebrand. His mental state declined steadily thereafter, and his physical condition with it, partly because he did not take adequate care of his diabetes. At the same time, his marriage failed, because he was totally absorbed with his work and lost touch with his family. In early 1982, when the IRS charged claimant, as the responsible officer of Hildebrand, with a large liability for the company's unpaid withholding taxes, his wife left him and did not renew contact for a year.

When claimant became president of Hildebrand, Globe's president thought that he was capable of handling the job. Globe's corporate counsel described claimant at that time as vigorous and self-assured, with a "can-do" attitude. A Hildebrand employe described him as a dominant figure, immediately taking charge of the company. According to that employe, claimant originally drank only coffee and iced tea at lunch, but after several months he began consuming alcohol instead. He thereafter began losing weight, grew despondent and had a complete change of attitude. Globe's corporate counsel described him at the end of 1981 as no longer well-groomed, nervous and unable to concentrate. Toward the end of his employment with Globe, in the summer of 1983, the corporate counsel no longer believed that claimant was fully in touch with reality.

Claimant did not recover from the decline which began in the fall of 1981. Globe eventually became aware of his

---

[2] Claimant testified that he believed the cause of his pancreatitis to be an injury to his pancreas when he broke his rib. There is no medical evidence supporting that theory.

drinking and ultimately insisted that he enter an alcoholic rehabilitation program. He did so in November, 1982, but he stayed only long enough to get his diabetes temporarily under control. After the Hildebrand liquidation was complete, claimant returned to working with Globe directly in a position with far less responsibility than previously. His condition did not improve and probably worsened. He left work in August, 1983, and has not worked since. Before he left, Globe's president prepared a workers' compensation claim form which claimant signed. The form listed hypertension caused by job stress as the condition for which he sought compensation.[3]

Claimant is clearly suffering from a complex of conditions; employer recognizes his problem but denies that it is related to his work. Dr. Parvaresh, Globe's psychiatrist, testified that claimant's major problem is organic brain syndrome, brought on by years of alcohol abuse. According to Parvaresh, claimant's alcoholism is probably physically based, the result of hereditary enzyme deficiencies. Like most alcoholics, claimant lies about his alcoholism or does not recognize it, with the result, in claimant's case, that his alcoholism, diabetes and hypertension have created a vicious circle which is taking him steadily downhill. Parvaresh does not believe that claimant's work for Hildebrand caused his disease; rather, it simply placed him in a position where his preexisting deficiencies became obvious. Because of claimant's failure to recognize his problems with alcohol, and because alcoholics typically lie about their consumption, Parvaresh does not believe that claimant stopped drinking in 1979. His opinion of the cause of claimant's condition was partially based on his conclusion that claimant had always continued heavy drinking without any significant breaks.

Claimant clearly does not recognize—or at least does not admit—the seriousness of his problem with alcohol even

---

[3] Claimant had hypertension when he first went to work for Globe. Although the employment may have exacerbated it, partly because he did not take his medication regularly, it appears to be the least of his problems. At the hearing Globe moved to limit claimant's evidence to hypertension. The referee denied the motion in his order, and Globe did not raise the issue before the Board. In this court it argues that claimant should be limited to hypertension or, at least, to the issues raised in the hearing. By not renewing its motion before the Board, it failed to preserve it for our review. *See Thomas v. SAIF,* 64 Or App 193, 667 P2d 565 (1983). It also has not shown any prejudice from the referee's action or that it was unable to present its full case at the hearing.

now. His historical statements about consumption must be treated with caution. However, other evidence convinces us, as it convinced the Board, that claimant did not drink, or did not drink excessively, from September, 1979, until late 1981. His wife and daughter, both of whom lived with him during that time, did not see any signs of drinking, and they were quite familiar with the signs. Claimant normally did most of his drinking in the evening, starting with a drink or two "to unwind," but he did not unwind in that fashion during that period. Those around him believed that he was in control of himself when he took over Hildebrand; several months later he seemed different, both to those who had known him previously and to those who had recently met him. That was precisely the time, according to his wife, when he again began having a few drinks in the evening. He went to a hospital on April 27, 1982, complaining of upper gastric pain, and told a physician that he had been drinking for six or seven months. That timing is also consistent with the changes others observed in claimant.

■    The only evidence which does not tie claimant's renewed drinking to his job is Parvaresh's opinion that he suffers from organic brain syndrome and that he must have been drinking all along, because all alcoholics lie about their drinking. Parvaresh did not see claimant until his symptoms were well established, and he did not administer any tests which would detect the presence of that syndrome. He based his diagnosis in part on claimant's wide-based gait, which is an indication of difficulty in foot positioning and walking. Other medical evidence attributes that gait to diabetic neuritis, which has produced almost total numbness in claimant's feet. In short, the preponderance of the evidence is that claimant's current problems are the result of depression, anxiety and renewed drinking which were caused by the stress he experienced at Hildebrand.[4]

■    The evidence on the nature of alcoholism in this record is limited and contradictory. Dr. Pidgeon, claimant's

---

[4] There is no evidence of significant non-job-related stress or other causation. Although claimant's marriage broke up in early 1982, that was itself a product of claimant's heavy workload and of his attempt to cope with his depression and stress by drinking. The marriage was in reasonably good condition before claimant began working for Hildebrand.

psychiatric expert, considers alcohol abuse to be the result of an underlying psychiatric disorder rather than a separate diagnosis; Parvaresh believes it to be a disease in itself with a significant physical basis.[5] Whichever opinion is correct, if either, claimant's work caused a worsening of his condition. If his alcohol abuse is a symptom of underlying depression and anxiety, the work stress produced or exacerbated those problems. If alcoholism is in itself a disease, he lost control of the disease because of work stress. Stress is therefore the major cause of his psychological decline and the resulting physical effects[6] which amount to a compensable condition.

A psychological condition may be an occupational disease without being caused by a claimant's work; it is sufficient if the work is the major contributing cause of an aggravation of the disease. ORS 656.802(1)(a); *James v. SAIF,* 290 Or 343, 350, 614 P2d 565 (1981); *SAIF v. Gygi,* 55 Or App 570, 573-74, 639 P2d 655, *rev den* 292 Or 825 (1982). A claimant may prevail by showing that the "work precipitated or worsened the condition." *Maddox v. SAIF,* 59 Or App 508, 510, 651 P2d 180 (1982). The real conditions that claimant faced on the job were objectively capable of producing and did produce stress and were a major contributing cause of his mental disorder. *McGarrah v. SAIF,* 296 Or 145, 675 P2d 159 (1983); *Elwood v. SAIF,* 67 Or App 134, 137, 676 P2d 922 (1984), *rev and remanded on other grounds,* 298 Or 429, 693 P2d 641, *on remand,* 72 Or App 771, 697 P2d 567, *rev den* 299 Or 443 (1985). When claimant began work, his problems were under control; as a result of the work they went out of control. Claimant's loss of control over his alcoholism together with

---

[5] This is another case in which counsel have given us little assistance in resolving a scientific dispute. Neither psychiatrist was asked to describe research studies supporting his opinion or to comment on studies supporting a different conclusion. Indeed, the experts mention no studies, and counsel made no other attempt to probe the foundations of their opposing views. We are left with conclusory and contradictory statements from two experts, with no certain way for us to evaluate either. *See SAIF v. Carter,* 73 Or App 416, 419 n 1, 698 P2d 1037 (1985). Fortunately, we can decide this case without having to choose between the competing scientific views.

[6] As claimant points out, alcoholism is only part of a complex problem which the stress produced. Pidgeon testified that, in layman's terms, claimant suffered a nervous breakdown; he has never recovered. Claimant's difficulties include alcohol abuse, depression, anxiety, diabetic neuritis and a general loss of control over his diabetes and his hypertension. The work stress produced depression and anxiety, which led to renewed alcohol abuse, which led to loss of control over the other conditions, and the loss of control over his diabetes contributed to the diabetic neuritis.

his depression and anxiety constituted a compensable worsening of his underlying disorder.

Affirmed.