Argued and submitted November 19, 1984, reversed and remanded February 6, reconsideration denied March 22, petition for review denied April 16, 1985 (299 Or 37)

In the Matter of the Compensation of
Arliss Ingram, Claimant.

## AMFAC, INC.,
*Petitioner,*

*v.*

## INGRAM,
*Respondent.*

(82-06472; CA A31160)

694 P2d 1005

Mildred J. Carmack, Portland, argued the cause for petitioner. With her on the brief were William Replogle and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Kenneth D. Peterson, Jr., Hermiston, argued the cause and filed the brief for respondent.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

NEWMAN, J.

### NEWMAN, J.

Employer seeks review of an order of the Workers' Compensation Board that reversed the referee and held that petitioner's claim was compensable as an occupational disease. ORS 656.802. We reverse.

After not working for six years, claimant began to work at the employer's processing plant on February 1, 1982. She inspected potatoes on a conveyor and trimmed out defective portions. She handled about 16 potatoes per minute and made two or three knife trims to each potato. Claimant is right-handed and held the trim knife in her right hand. Within about two weeks she began to have numbness and tingling in her right hand. At the end of February she saw Dr. Johnson, a general practitioner, who suspected carpal tunnel syndrome. On May 17, 1982, Dr. Hendricks made nerve conduction studies and confirmed carpal tunnel syndrome. Dr. Nathan, a hand surgeon, examined claimant at employer's request on June 14, 1982, and diagnosed bilateral carpal tunnel syndrome, right greater than left.[1] In November 1982 claimant had surgery on her right arm.

The parties do not dispute that, when claimant began work for employer in February 1982, she probably had had carpal tunnel disease for at least two years. She did not, however, have any symptoms before starting to work. Moreover, claimant's off-the-job activities before and during her employment were normal. Her work at the plant required repetitive hand, wrist and arm motions that far exceeded what she did off the job or before her employment. The referee found that claimant's work activity was the major contributing cause of her symptoms. The referee held, however, that the

---

[1] Carpal tunnel syndrome is the name for the symptoms of numbness and tingling in the hand from carpal tunnel disease. Dr. Nathan testified that

"when we have symptoms or physical findings, we have a syndrome. When we have the same changes in the nerve on the electrophysiological testing without symptoms, we have carpal tunnel disease. Disease becomes syndrome with symptoms."

This is the first carpal tunnel case before us in which the distinction has been clearly drawn between carpal tunnel disease and carpal tunnel syndrome.

carpal tunnel syndrome was not compensable, because claimant had failed to prove a worsening of her underlying condition, relying on *Weller v. Union Carbide,* 288 Or 27, 602 P2d 259 (1979).

After the referee's order, this court decided *Wheeler v. Boise Cascade,* 66 Or App 620, 675 P2d 499 (1984), which held that proof of a worsened underlying condition is not necessary if the claimant had not previously sought medical attention for the underlying condition. Because claimant was asymptomatic and had not sought medical attention before she commenced work with employer, the Board ruled that she did not have to prove a worsening of her underlying condition:

> "Because *Weller* does not apply to this case, and because we find that claimant has proven by a preponderance that her work activities were the major contributing cause of her symptoms, we reverse the Referee. The employer's denial should be set aside."

■      In *Wheeler v. Boise Cascade Corp.,* 298 Or 452, 693 P2d 632 (1985), the Supreme Court reversed our decision. It stated:

> "* * * The requirements for a claimant to prevail were set forth in *Weller* as follows:
>
> " '* * * we believe that in order to prevail claimant would have to prove by a preponderance of evidence that (1) his work activity and conditions (2) caused a worsening of his underlying disease (3) resulting in an increase in his pain (4) to the extent that it produces disability or requires medical services.' " 298 Or at 457 (footnote omitted.) [2]

The Supreme Court stated that this court's opinion in *Wheeler* "created a distinction that was not there," and held "that the *Weller* analysis is the appropriate analysis whether the conditions are symptomatic or asymptomatic at the time of employment." 298 Or at 457-58.

■      This is an occupational disease claim. *James v. SAIF,* 290 Or 343, 348, 624 P2d 565 (1981). Claimant must prove by a preponderance of the evidence that her work activity caused a

---

[2] Although the court did not say so in *Wheeler,* a claimant must also establish that the work was the major contributing cause of the worsening of the underlying disease. *McGarrah v. SAIF,* 296 Or 145, 675 P2d 159 (1983); *Dethlefs v. Hyster Co.,* 295 Or 298, 667 P2d 487 (1983).

worsening of her underlying carpal tunnel disease, even though she was asymptomatic and did not require medical services until after she commenced the employment. *Wheeler v. Boise Cascade Corp., supra.* Claimant, however, did not establish by a preponderance of the evidence that her work activity worsened her underlying disease.

■ Claimant argues, and the evidence establishes, that an increase in pressure on the median nerve is a worsening of the disease. She then argues that her symptoms, or carpal tunnel syndrome, reflect an increase in pressure on the median nerve. She argues that, because she first had symptoms after she commenced work, she must have suffered from an increase in pressure on the median nerve because of her work activities. Therefore she argues that her work caused a worsening, including an acceleration, of her underlying carpal tunnel disease.

There is, however, no medical evidence to support her claim that her work caused a worsening of her underlying disease. Dr. Nathan wrote that "it does not seem reasonable that the work activity is either the cause of the underlying disease or significantly responsible for the symptoms." He testified that, if the cumulative effect of her hand-wrist activities at work was greater than would have occurred off the job, which it was, that the work exposure brought about the need for medical treatment and the disabling condition sooner than might otherwise have occurred. Dr. Nathan, however, testified that the appearance of symptoms does not indicate that the disease process has worsened or changed.[3] He testi-

---

[3]
"Q. [Employer's attorney] As I understand from your testimony, the mere perception of symptoms or the appearance of symptoms which the patient reports does not indicate that that disease process has worsened or changed?

"A. That's correct.

"* * * * *

"Q. [Claimant's attorney] Mr. Replogle [employer's attorney] asked if you agreed that the appearance of symptoms, whether that means a worsening or changing of the tissue engorgement, is what you described as the disease. And you replied no. I'm assuming that you mean there is not a necessary relationship between the appearance of symptoms and the degree of engorgement of the tissues. Is that correct?

"A. It's partially correct.

"Q. And so, as we spoke of earlier, the appearance of symptoms, just as much

fied that he was unable to say that the acceleration of the symptoms reflected a worsening of the disease process.[4] He also testified:

as it may not represent a further engorgement of the tissues, may represent a further engorgement of the tissues, which would thereby cause some quantum of increased compression of the median nerve?

"A. We're both trying to seek the truth, which we're not capable of doing. We have symptoms, we have engorgement. We have changes in the nerve.

"Q. But it's engorgement that's the disease. All the other changes —

"A. The engorgement is not necessarily the disease. When it leads to slowing of the nerve, then there is a disease process. You may very well have engorgement. You could have transient engorgement, limited time engorgement. And I believe we're talking about, at the most, a few days, at most a few days, without nerve conduction study changes, electrical conduction charges. I believe in the short term that you can have symptoms such as that in waxing and waning of a disease process or beginning of the process, that there would be no demonstrable nerve conduction changes related to the amount of change in the symptoms."

4

"Q. [Claimant's attorney] Now, earlier, my understanding was that the degree of nerve damage is related to the amount of compression and the duration of compression.

"A. Correct.

"Q. Does it follow, I guess is what I'm saying, that symptoms indicate more compression or longer duration compression than no symptoms, but with this potential slowing of the nerve anyway?

"A. We can see — let me start again. I cannot state in any — that if we have a patient on day 1 and day 5 and a patient on day 10, I have no reason, in some cases, to believe that if on day 5 she has symptoms that the degree or the extent of slowing will be worse on day 5 than it would be on day 1 or day 10, because the symptoms may be just a reflection of not a change in the nerve, but reflection in a change of the person herself to withstand or to tolerate some discomfort. For instance —

"* * * * *

"Q. Is it just as likely or is it more likely that the perception of significant symptoms, where none were reported before, would represent a worsening compression of the median nerve?

"A. I can't state that it does.

"Q. ·Well, but you can't state the other way either, that it doesn't. Is that right? I mean, in the same way that you testified earlier, that it could represent simply difference in perception, it could represent a change in the compression of the nerve.

"A. Yes, it could. But I can't demonstrate that.

"Q. No. And it could just as much as it could not?

"A. That is — not necessarily.

"* * * * *

"Q. So all you can say now without that sort of intense clinical data, is that it could but you don't know for certain?

"A.   I can state as a reasonable medical probability that if she was not at work, that she would have presented with the symptomatology compatible with a carpal tunnel syndrome and underlying disease whether she was or was not gainfully employed for the 15 days at this particular employer, at a time relative to the time that she did. I can't say it would have been the same day. But the markings were on the wall. They would occur. And I'm not saying five years from now, I'm talking about a proximity, I'm sure, in months.

"Q.   [Claimant's attorney] Okay. Did the work that she did in the interval between February 1 and when she presented to the doctor on February 26, in your opinion, hasten her presentation of carpal tunnel syndrome?

"A.   If we confirm that these activities, in fact, and the accumulative effect were greater than she would have done in the same period of time at home as a housewife, and the symptoms occurred while doing these activities, I can't disassociate the two. However, I cannot demonstrate — I cannot demonstrate that this represents a worsening of the disease process."

Claimant's attorney asked him directly:

"Q.   This is my last little try at this. A presentation of symptoms can be the result of increased pressure on the median nerve. I believe you've already testified to that.

"A.   Yes.

"Q.   Increased pressure on the median nerve caused by engorgement is what I understand - defined by you - is the definition of carpal tunnel, provided that it results in nerve conduction delays.

"A.   Yes, but, again, you're not addressing the fact that there's long-term effects of pressure and short-term effects of pressure. I cannot — we're dealing with the short term, 15 days short term. I cannot demonstrate from the documents given to me, nor does it seem reasonable to assume, based on observing that film, videotape, and looking at the hours of life and so on, that this activity had a material effect on the disease process.

"Q.   At the microcellular level, the engorgement comes about as a result of — can come about as a result of venostasis, as I understand it.

"A. I don't know. For me to be comfortable, the only thing I can say is, I cannot demonstrate worsening."

"A. Correct.

"Q. This can have a kind of a synergistic effect, where the nerve becomes ischemic and itself enlarges, sort of, which further presents to ischemia. And your testimony earlier was that nerve conduction sometimes can be - maybe I've gone too far there - that the nerve itself can be damaged within very short periods of time?

"A. Correct. But I'm not able to demonstrate — in fact, I think the evidence here demonstrates that the compression here, though, is a very long-term process. The medical evidence given to me does not allow me to assume that this work activity, however, caused an acceleration of the — what I believe would have been a gradual worsening of her condition."

Claimant's other medical evidence establishes a causal relationship between claimant's work and her carpal tunnel syndrome. It does not support claimant's position, however, that her work caused a worsening, including an acceleration, of her underlying carpal tunnel disease.

Reversed and remanded.