Argued and submitted January 31, reversed and remanded for acceptance of claim April 23, Clairmont's reconsideration denied June 6, SAIF's reconsideration denied July 25, Clairmont's petition for review denied July 15 (301 Or 338), SAIF's petition for review denied August 26, 1986 (301 Or 666)

In the Matter of the Compensation of
Anna M. Adsitt, Claimant.

## ADSITT,
*Petitioner,*

*v.*

## CLAIRMONT WATER DISTRICT et al,
*Respondents.*

(WCB 84-02227; CA A35718)

717 P2d 1231

James L. Francesconi, Portland, argued the cause for petitioner. With him on the brief was Francesconi & Cash, P.C., Portland.

Gregory K. Zeuthen, Oregon City, argued the cause and filed the brief for respondent Clairmont Water District.

Darrell E. Bewley, Assistant Attorney General, Salem, argued the cause for respondent SAIF Corporation. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Joseph, Chief Judge, and Van Hoomissen and Young, Judges.

JOSEPH, C. J.

**JOSEPH, C. J.**

Claimant seeks review of a Workers' Compensation Board order which denied her on the job stress claim. On *de novo* review we find that claimant suffered an exacerbation of her pre-existing mental disease and that work stress was the major contributing cause of the exacerbation. We therefore reverse and remand for acceptance of the claim.

Claimant, who is in her early fifties, has a long history of alcohol abuse accompanying or caused by depression and low self-esteem, all superimposed on a hysterical personality. She has frequent mood shifts and cries easily. At the time in question she was also going through a stressful menopause. She married for the second time when she was 36 years old and has a daughter and a son by that marriage. The marital relationship has had its ups and downs, with the downs exceeding the ups. Her family life has been a source of stress, which contributed to her continued drinking; several times she considered divorce. Her son had behavior problems in school, and in late 1980 he began several months of therapy with Dr. Cooley, a psychologist. The therapy involved the entire family relationship, and it apparently led to temporary improvement. The therapy was renewed for a short period in March and April, 1983.

In late 1979, claimant began working for employer as the billing clerk in a three-person office. She enjoyed the work, particularly the public contact. Evaluations of her job performance were generally favorable, with some references to poor work organization and emotional instability. The other people in the office were Johnson, employer's superintendent, and Browning, the bookkeeper. When Johnson had a stroke in the summer of 1982, Browning was appointed office manager. She had previously trained claimant and had always been the lead person in the office. She acted as though she had supervisory authority and generally kept check on whether claimant was doing her job, partly because some of Browning's work was based on claimant's work. On the other hand, employer's board, when it adopted a job description for Browning's position, deleted from her responsibilities supervision of the billing clerk. It did not change the job description when it made Browning office manager.

Claimant did not believe that Browning could legitimately supervise her and resented her attempts to do so. The organizational situation was sufficiently ambiguous that claimant had a reasonable basis for her belief. However, Johnson consulted Browning when he made his annual evaluation of claimant's work performance and otherwise relied on her to deal with claimant. Johnson disliked the personnel part of his job, and he occasionally asked Browning to deliver criticisms of claimant which he wished to make or to participate in meetings where he and claimant discussed particular problems about her work.

Claimant believed that Browning harassed her after becoming office manager by constant criticism of her work and appearance, that Browning had no right to supervise her and that Johnson did not act to straighten things out. As a result of Browning's actions, claimant felt herself under increasing stress, and her drinking and other problems became worse than they had been at any time since she took the job, ultimately leading to her resignation in August, 1983. Employer argues that Browning and Johnson acted appropriately under employer's rules in giving claimant only the gentle criticism which was absolutely necessary to the adequate performance of her job and that claimant's problems are the result of her pre-existing disease and of non-work stress. Although the referee, and to a lesser extent the parties, believed that the case turned on whether the events of which claimant complains really occurred, we do not see any real conflict in the evidence on that point. Rather, the disagreements in the testimony are the result of differences of perception of the meaning of events which all witnesses agree actually did happen. The crucial question is whether claimant's interpretations of these events, and the effects of those interpretations in producing her mental problems, make her condition in August, 1983, compensable.

Claimant and Browning brought different needs and expectations to their work, and those differences are the source of most of the problems that claimant experienced. Claimant lives an isolated life in a rural area with her husband and children. She does not have many friends and, during most of the time she worked for employer, her home life gave her little emotional support. She saw her job as a social outlet and a co-worker as someone with whom she ought to be able to

discuss her problems. She enjoyed talking with customers when they came to pay their bills; even talking with those whose accounts were delinquent gave her an opportunity to share and possibly to help solve their problems. In that way the job provided the supportive human contact that she strongly desired. Browning, on the other hand, emphasized the work to be done. She is considerably younger than claimant, and she saw the job as a career rather than as being in any sense a social occasion. She wanted a pleasant relationship with her co-workers, but primarily she wanted an opportunity to do her work and expected them to do theirs efficiently and competently. Claimant's constant talk and frequent personal phone calls upset her, and she had little tolerance either for claimant's delays in doing the paperwork which was necessary for Browning's own work or for the general disorganization of claimant's work.

The differences in attitude and expectations between claimant and Browning are crucial to their different perceptions of what happened. We find that all of the things about which claimant testified actually occurred.[1] Browning criticized claimant for failing to post payments promptly, went through her desk searching for items which Browning needed in order to make required reports, left adhesive tabs on certain papers instructing claimant what to do with them and asking why she had not processed them previously, criticized her for dirty hair and was unresponsive to her attempts at conversation. In one instance which particularly upset claimant, Browning urged claimant to take an afternoon off and then called her at home about her failure to "back up" several weeks' of computer work. When claimant finally complained to Johnson about Browning's actions, Johnson told her that Browning had acted properly and refused to consider any changes.

Although employer presents a reasonable explanation for each of Browning's and Johnson's actions and suggests that most of the problems arose from claimant's failure to do her own work, those explanations are irrelevant. Claimant's complaints are based on events that actually occurred. Although her belief that they represented a campaign of

---

[1] The specific incidents we now discuss all occurred during the months immediately before claimant stopped working for employer.

harassment and rejection may have been a misperception of the purpose behind them, she did not misperceive the events themselves. Those events, viewed objectively, were capable of producing stress. An employe subject to frequent criticism of herself and her work in a relatively short period could experience stress, especially when all previous criticisms had been readily resolved.[2] Thus two of the criteria for compensability of a stress claim are met.

In order for claimant's claim to be compensable she must also have suffered a mental disability, and the real events must have been the major contributing cause of that disability. *McGarrah v. SAIF,* 296 Or 145, 675 P2d 159 (1983); *Elwood v. SAIF,* 67 Or App 134, 676 P2d 922 (1984), *rev and remanded on other grounds,* 298 Or 429, 693 P2d 641, *on remand* 72 Or App 771, 697 P2d 567, *rev den* 299 Or 443 (1985). The described events did not cause claimant's underlying mental illness and alcoholism. However, an exacerbation of an underlying condition caused by work activities is itself a compensable occupational disease if it reflects a worsening of the condition and involves an increase in pain which produces disability or requires medical services. *Weller v. Union Carbide,* 288 Or 27, 35, 602 P2d 259 (1979). The exacerbation need not be a *permanent* worsening of the condition, so long as it is a worsening. *Wheeler v. Boise Cascade,* 298 Or 452, 457, 693 P2d 632 (1985). We find that claimant suffered an exacerbation of her underlying condition immediately before she left work and that that exacerbation was a worsening of her condition.

Johnson and Browning both thought that claimant was in worse condition in the months before she quit, and the medical evidence leads to the same conclusion. Her family physician, who had decided against prescribing anti-depressants in the fall of 1982 because he was worried about how they would interact with alcohol, began prescribing them in May, 1983. Claimant continued on the medication until she quit. Dr. Turco, SAIF's psychiatrist, noted that her alcoholism had increased during the employment and believed that she

---

[2] This case is distinguished from *Leary v. Pacific Northwest Bell,* 67 Or App 766, 680 P2d 5 (1984), because the claimant in *Leary* misperceived the actual events. In contrast, claimant in this case correctly perceived the events, although she may not have correctly interpreted their meaning.

had suffered a situational reaction. Cooley and claimant's physician also believed that she was in a particularly difficult state at that time. Although there may be a distinction in a physical disease between an increase in symptoms and a worsening of the underlying condition, *but see Weller v. Union Carbide, supra,* 288 Or at 30 n 2, nothing in the record suggests a physical component to claimant's problems. We can find no basis for a distinction between the symptoms of a mental disorder and the disorder itself; if the symptoms are worse, the disorder has necessarily worsened, at least until the symptoms abate. The exacerbation of claimant's condition therefore constituted a worsening of her disease.

■ It is clear that the work conditions were the major contributing cause of claimant's worsening. Her family situation was much less tense than it had previously been and was not a significant cause of stress. When claimant described her problems, she concentrated almost exclusively on her difficulties with Browning and what she saw as a continuous barrage of unfair criticism of her job performance. Claimant's physician, Cooley and Turco agreed that those difficulties were the major contributing cause of her worsened condition. Turco points out that a person without claimant's underlying problems might have performed adequately and thus not have been subjected to criticism or might have responded appropriately to any criticism which she did receive, but that is also irrelevant. It does not matter who is responsible for the work conditions or whether claimant's perceptions of those conditions is the same as an objective outside observer's. The conditions could produce stress and did produce a worsening of claimant's condition. *See Petersen v. SAIF,* 78 Or App 167, 714 P2d 1108 (1986); *SAIF v. Shilling,* 66 Or App 600, 675 P2d 1081 (1984); *SAIF v. Gygi,* 55 Or App 570, 576-77, 639 P2d 655, *rev den* 292 Or 825 (1982). The exacerbation of claimant's condition meets the *McGarrah* and *Weller* tests.

■ SAIF argues, nonetheless, that the claim should not be compensable, because what happened to claimant was not in the scope of her employment. It points out that ORS 656.802(1)(a) defines an occupational disease as one "which arises out of and *in the scope* of the employment * * *," but a compensable injury is one which arises "out of and *in the course* of employment * * *." ORS 656.005(8)(a). (Emphasis

supplied.) It asserts that the scope of employment is a narrower concept than the course of employment and that what claimant experienced was not in the scope of her employment. We need not decide what distinctions may exist between these definitions, for what happened to claimant was in the scope of her employment. Criticism of an employe's job performance is a normal part of employment and is within its scope. Browning's other actions which contributed to claimant's condition related to the criticism she gave and were thus also within the scope of claimant's employment. The exacerbation of claimant's underlying depression and alcoholism was a compensable occupational disease.

Reversed and remanded for acceptance of the claim.