Argued and submitted February 19, affirmed August 13, reconsideration denied October 31, petition for review denied December 3, 1986 (302 Or 342)

In the Matter of the Compensation of
Marvin L. Noffsinger, Claimant.

## STATE ACCIDENT INSURANCE FUND CORPORATION,
*Petitioner,*

*v.*

## NOFFSINGER,
*Respondent.*

(WCB 84-05413, 84-05412; CA A36545)

723 P2d 358

Darrell E. Bewley, Assistant Attorney General, Salem, argued the cause for petitioner. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

James L. Edmunson, Eugene, argued the cause for respondent. With him on the brief were Robert J. Guarrasi and Malagon & Associates, Eugene.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Warden, Judge.

RICHARDSON, P. J.

## RICHARDSON, P. J.

The issue in this workers' compensation case is whether claimant, who contends that he suffers from severe depression as a result of job pressures and harassment and horseplay by his co-workers, is entitled to compensation for an occupational disease. The referee and the Workers' Compensation Board held that he is. SAIF seeks review, and we affirm.

Claimant was 44 at the time of the hearing in this matter. He has a college degree in physical education. Although he taught physical education for one year after graduation, most of his work experience has been in lumber mills. In early 1980, he began working in employer's lumber mill, and he worked there until he was discharged in April, 1984. He initially worked on the green chain, but in October, 1981, he began working as a clipper operator.

The "clipper" is a machine which cuts out defective portions of veneer that has been produced on a lathe. It is operated either manually or by computer control and at either high or low speed. Its effective operation depends on the quantity and quality of veneer ribbon produced by the lathe. After the veneer passes through the clipper, it is transported to the green chain. The operation of the green chain depends on the quality and quantity of the veneer which has been clipped. Claimant was responsible for maximizing the efficient use of veneer, thereby increasing earnings from veneer production. Operation of the clipper is a critical phase in the production of plywood.

In January, 1982, the mill was purchased by a corporation whose president began actively to oversee the operation of the mill and to seek ways to increase production. He compared the output of the day shift with that of claimant's shift, the swing shift, and noted that the day shift produced more veneer. In mid-1982, employer transferred claimant to the day shift to determine whether he was the source of the problem. Claimant had his own ideas concerning the production discrepancy and, in late 1982, when he believed that he and the green chain crew were being blamed for the swing shift's lower production, he spoke with the president; in January, 1983, he submitted to the president a 45-page critique of the operation of the mill. Claimant believed that the president did not adequately understand the operation of the

mill and that he, claimant, understood it better. He believed that, for various reasons, the day shift had an advantage over the swing shift. He criticized a bonus plan initiated by the president, because he perceived that it was unfair to the swing shift. He also felt that the plan placed undue pressure on the swing shift. He disagreed with the manner in which production figures were calculated. On at least one occasion, he wrote his own production figures over those posted by the employer. He also felt pressured by his supervisor and the president to produce at maximum efficiency and, at times, maximum speed.

In addition to production pressures, claimant was also the victim of ongoing horseplay, harassment and criticism by other employes. For the most part, he was the only employe subjected to such abuse. One employe on the green chain periodically yelled at claimant, criticized his operation of the clipper and suggested that he either quit or be fired. The lathe operator occasionally threw food at him. Other workers occasionally threw wood chips at him. They also threw firecrackers or placed them under his seat; his supervisor and two other employes once placed firecrackers in the space heater in his work station, causing it to blow apart while he was warming his hands. After the heater was repaired, some employes placed crab parts in it, creating an obnoxious odor in the work area. Claimant was quite upset by these events. When he asked his supervisor to put a stop to them, the supervisor denied that they had even occurred.

In early 1984, the employer made a further push to increase production. Claimant operated the clipper on high speed, which he claimed caused eye strain and tension and, consequently, decreased efficiency. Claimant wrote a letter to the president complaining about the demands being placed on him. The president replied that claimant had a negative attitude, to which claimant responded with another letter. In April, 1984, the president spent several hours observing claimant operate the clipper. He asked claimant why he was allowing the clipper to be operated automatically by the computer rather than manually, and claimant replied that it was too difficult to operate manually. Claimant was discharged the next evening. The employer's stated reason was that he would not follow instructions without considerable argument.

Claimant was quite upset following his discharge and had difficulty sleeping for the next night or two. On April 24, 1984, he visited a doctor, who noted elevated blood pressure and general agitation, prescribed medication and referred him for psychiatric evaluation. Dr. Carter, a psychiatrist, began treating claimant in June, 1984, and concluded that claimant was suffering from "[m]ajor depression, single episode, with melancholia," which was "substantially and significantly derived from job stress as perceived & experienced by patient." Carter reported to SAIF in August, 1984, that claimant's condition had improved through intensive psycho-therapy and that "the major depression that he presented with was, indeed, derived from the vocational vector." Dr. Holland, also a psychiatrist, examined claimant at the request of SAIF. On August 20, 1984, he submitted a report in which he diagnosed the same illness as had Carter and stated that claimant had substantially improved. He concluded that the principal contributing factor to that illness was the job termination. He stated:

"It is my opinion Mr. Noffsinger had a significant psychiatric illness which surfaced in the context of him [sic] being terminated. I believe the most proximate cause of his psychiatric illness was his termination from work while there were, to his accounting, significant vocationally related pyschosocial [sic] stressors ongoing in the latter days of his employment."

On September 10, 1984, Carter reported:

"It is my opinion, within the realm of reasonable medical probability, that Mr. Noffsinger's presenting major depression, arose primarily from stress related to his most recent job with Yoncalla Timber Products. It is my impression that Mr. Noffsinger presents with pre-morbid psychopathology in the form of the atypical personality disorder, which renders him vulnerable to abrasive interaction with his fellow employees and management personnel. This, in part, derives from the fact that Mr. Noffsinger is a highly intelligent man, educated generally beyond the level of that of his co-workers, and probably many of his supervisors. Consequently, within the millwork setting, it is my impression that, he attempts to deal with stress encountered on the job by an over-ideational approach relative to his particular job and the expectations of function that go along with it, that this, in turn, contributes to an increase in distress experienced by Mr. Noffsinger, and

probably by other people around him. As he attempts to reduce the stress by intellectualization, and as this resort to anxiety relief is overwhelmed, there is increased reliance upon compulsive and obsessive mechanisms to decrease stress. As these fail, somatization, hostility, and paranoia emerge. In view of this impression, it is my opinion that the Axis II disorder, atypical personality disorder, was aggravated by the stress experienced by Mr. Noffsinger in the pursuit of his job."

SAIF, the employer's insurer, denied claimant's occupational disease claim.[1] The referee found that claimant had proven that work conditions were the major contributing cause of his depression and ordered SAIF to accept the claim. The Board affirmed without elaboration.

An "occupational disease" is "[a]ny disease or infection which arises out of and in the scope of employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein." ORS 656.802(1)(a). In comparison, a "compensable injury" is an "accidental injury * * * arising out of and in the course of employment." ORS 656.005(8)(a). Although the latter definition appears to contemplate a two-part test, in *Rogers v. SAIF,* 289 Or 633, 642, 616 P2d 485 (1980), the court rejected the mechanical application of that test and adopted a unitary "work-connection" approach to determine whether a given injury is compensable: *i.e.,* "[I]s the relationship between the injury and the employment sufficient that the injury should be compensable?" The "arising out of employment" and "course of employment" criteria are two parts of that unitary work-connection analysis. *Phil A. Lively Co. v. Russ,* 296 Or 25, 29, 672 P2d 337 (1983). We see no reason not to apply the unitary work-connection analysis to the "arising out of and in the scope of employment" language of the occupational disease statute, despite some difference in the wording of the two statutes. *See Elwood v. SAIF,* 298 Or 429, 433, 693 P2d 641 (1985) (dictum using *Rogers* analysis in occupational disease context). If the relationship between the disease and the employment is sufficient, then the disease arises out of and in the scope of employment. Of course, because ORS 656.802(1)(a) requires that the disease be one

---

[1] Claimant also filed a claim for hearing loss. That claim is not involved in this appeal.

"to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein," the claimant must also prove that work conditions, when compared with non-work conditions, were the major contributing cause of the disease. *Dethlefs v. Hyster Co.*, 295 Or 298, 667 P2d 487 (1983); *SAIF v. Gygi*, 55 Or App 570, 639 P2d 655, *rev den* 292 Or 825 (1982).

■ There were four factors which contributed to claimant's psychiatric condition: (1) the pressure of operating the clipper at maximum efficiency; (2) the conflict between claimant and the president concerning the efficient operation of the mill; (3) horseplay and harassment from his fellow employes; and (4) the loss of his job. SAIF does not challenge the first, and it does not dispute that psychiatric problems which result from the pressure to produce that employers place on employes are compensable. SAIF challenges only the last three factors. Concerning the last, it argues that, under *Elwood v. SAIF, supra,* claimant is not entitled to compensation for illness resulting from the mere act of his discharge and the loss of his job. We agree. There is no evidence that there were any particularly stressful events accompanying the discharge itself, and he does not claim that there were. Under those circumstances we do not consider the stress attendant on his discharge in determining whether he suffered an occupational disease.

The focus of SAIF's appeal is on the second and third factors. It argues that they were outside the "scope of employment" as that phrase is used in ORS 656.802(1)(a) and that they therefore may not be considered as job-related conditions contributing to his psychiatric condition. It makes the same argument that we sidestepped in *Adsitt v. Clairmont Water District,* 79 Or App 1, 717 P2d 1231, *rev den* 301 Or 338, 301 Or 666 (1986), where the claimant alleged that criticism and related actions by a co-worker were the major contributing cause of the worsening of her underlying psychiatric problems. We stated:

> "SAIF argues, nonetheless, that the claim should not be compensable, because what happened to claimant was not in the scope of her employment. It points out that ORS 656.802(1)(a) defines an occupational disease as one 'which arises out of and *in the scope* of the employment * * *,' but a compensable injury is one which arises 'out of and *in the*

*course* of employment * * *.' ORS 656.005(8)(a). (Emphasis supplied.) It asserts that the scope of employment is a narrower concept than the course of employment and that what claimant experienced was not in the scope of her employment. We need not decide what distinctions may exist between these definitions, for what happened to claimant was in the scope of her employment. Criticism of an employe's job performance is a normal part of employment and is within its scope. Browning's other actions which contributed to claimant's condition related to the criticism she gave and were thus also within the scope of claimant's employment. The exacerbation of claimant's underlying depression and alcoholism was a compensable occupational disease." 79 Or App at 7-8.

SAIF again urges us to define "scope of employment" very narrowly. It argues that only those conditions that are directly related to the performance of the task claimant was hired to perform may be considered in determining whether he suffers an occupational disease. It concludes that the horseplay and harassment by his fellow employes and his self-appointed mission to tell the president how to run the mill were not directly related to claimant's operation of the clipper and that those factors may not be considered in determining whether he suffered an occupational disease.

There is no legislative history concerning the Occupational Disease Law to assist us in determining whether, in choosing to define "occupational disease" by using the phrase "scope of employment" rather than "course of employment," the legislature intended to define more narrowly occupational diseases than it had compensable injuries. *See James v. SAIF,* 290 Or 343, 349, 624 P2d 565 (1981). However, we are guided by the maxim that the workers' compensation act must be liberally construed to ensure that workers disabled or injured as a result of their employment are compensated. *Rogers v. SAIF, supra,* 289 Or at 643. SAIF's narrow interpretation of ORS 656.802(1)(a) fails to consider the actual conditions under which workers perform their assigned tasks. They do not work in a vacuum; they are generally involved in interpersonal relationships with other workers. As this case demonstrates, those relationships can be less than idyllic. Yet, they are as much within the scope of their employment as is the performance of assigned tasks.

The horseplay and harassment by claimant's fellow

employes were sufficiently work-connected that any illness that arose therefrom could be considered to have arisen out of and in the scope of claimant's employment within the meaning of ORS 656.802(1)(a). In *Stark v. State Industrial Acc. Com.,* 103 Or 80, 204 P 151 (1922), the court held that a worker's death as a result of horseplay that he had initiated arose out of and in the course of employment and was therefore compensable. The evidence suggested that the horseplay that the worker had engaged in—shooting an airhose at a co-worker—was commonplace where he worked. The court stated:

> "The injury in question was caused by an industrial accident. It was a peril of the service. Under the usual conditions there prevailing the employees were more or less subject to such peril. It was an unexpected accident, but nevertheless may reasonably be said to have arisen out of and in the course of the employment. It was an incident of such employment by reason of the appliance used in the work, and the custom which prevailed of the employees, without the infraction of any enforced rule of the establishment, diverting the use of the air hose to sport. * * *
>
> "* * * * *
>
> "* * * It might be remarked parenthetically, that it is not to be supposed that a crew of men could be obtained unless some of them during working hours would play practical jokes on their fellow-workmen, especially if such men were red-blooded Americans. It is not conceivable that it was the intention of the legislature to preclude an injured workman or his beneficiaries from the benefits of the Workmen's Compensation Act for the reason that at the time of, or immediately prior to, the accident causing the injury such workman had been engaged in play, unless the injury or death results to such workman 'from the deliberate intention of the workman himself to produce such injury.' We think it may fairly be said under the facts in this case that the accident arose 'out of and in the course of his employment.' * * *" 103 Or at 98-101.

In the landmark decision of *Matter of Leonbruno v. Champlain Silk Mills,* 229 NY 470, 471-73, 128 NE 711 (1920), Judge Cardozo, in upholding an award of compensation for a worker who lost his eyesight when he was struck by an apple thrown by another worker, wrote:

> "That it arose 'in the course of employment' is unquestioned. That it arose 'out of' employment, we now hold. The

claimant's presence in a factory in association with other workmen involved exposure to the risk of injury from the careless acts of those about him. He was brought by the conditions of his work 'within the zone of special danger' * * *. Whatever men and boys will do, when gathered together in such surroundings, at all events if it is something reasonably to be expected, was one of the perils of his service. We think * * * that it was 'but natural to expect them to deport themselves as young men and boys, replete with the activities of life and health. For workmen of that age or even of maturer years to indulge in a moment's diversion from work to joke with or play a prank upon a fellow workman, is a matter of common knowledge to every one who employs labor.' The claimant was injured, not merely while he was in a factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life. The risks of such associations and conditions were risks of the employment * * *.

"* * * The risks of injury incurred in the crowded contacts of the factory through the acts of fellow-workmen, are not measured by the tendency of such acts to serve the master's business. Many things that have no such tendency are done by workmen every day. The test of liability under the statute is not the master's dereliction, whether his own or that of his representatives acting within the scope of their authority. The test of liability is the relation of the service to the injury, of the employment to the risk." (Citations omitted.)

The majority rule in the United States is that a nonparticipating victim who suffers an injury at the hands of his fellow employes' horseplay is entitled to compensation. 1A Larson, Workmen's Compensation Law 5-159 - 5-163, § 23.10 (1985). The reasoning of many of those cases is that horseplay is a risk inherent in employment and injuries arising therefrom can be said to have arisen "out of and in the course of employment." We are persuaded that horseplay at the workplace is so commonplace that it is also within the "scope of employment" within the meaning of ORS 656.802(1)(a). The horseplay and harassment of claimant's fellow employes may properly be considered under that statute as causal factors of his emotional illness.

The same is true of claimant's conflict with the president of the mill. Like the co-worker's criticism in *Adsitt v. Clairmont Water District, supra,* 79 Or App at 8, that sort of

conflict is "a normal part of employment and is within its scope."

■     In order for his claim to be compensable, claimant must prove by a preponderance of the evidence that the real events and conditions of his employment, when viewed objectively, were capable of producing stress and that they were in fact the major contributing cause of his psychiatric condition. *McGarrah v. SAIF,* 296 Or 145, 675 P2d 159 (1983). The pressure to produce placed on claimant, the harassment and horseplay of his fellow employes and the conflict with the president of the mill all actually occurred and, when viewed objectively, were capable of producing stress. Carter and Holland agree that claimant suffered from major depression. Holland apparently believed that the loss of claimant's job was the chief cause of that depression, although in his report he acknowledges that claimant was subject to stressful conditions at work before he was terminated; as we have stated, we may not consider the mere loss of employment as a causal factor in claimant's illness. Carter clearly placed the blame for claimant's illness on the actual conditions of his employment. Carter was claimant's treating psychiatrist, and we find his analysis and opinion more persuasive. Claimant's illness is compensable.

Affirmed.